IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:24-CV-00132-FL

**Shaun Gillikin,**

        Plaintiff,

v.

**Frank J. Bisignano**, Commissioner of Social Security,[1]

        Defendant.

**Memorandum & Recommendation**

Plaintiff Shaun Gillikin challenges an Administrative Law Judge's decision to deny his application for social security income. Gillikin claims that the ALJ erred in reaching that decision by failing to fully address the medical opinion evidence. Both Gillikin and Defendant Frank J. Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 10, 12.

After reviewing the parties' arguments, the court has determined that the ALJ erred in his determination. The ALJ found a medical opinion partially persuasive. But for some of Gillikin's limitations, the residual functional capacity (RFC) determination neither incorporated the restrictions nor sufficiently explained why the ALJ omitted them. This error impedes meaningful judicial review. The undersigned thus recommends that the court grant Gillikin relief, deny Bisignano relief, and remand the matter to the Commissioner for further consideration.[2]

---

[1] The court substitutes Frank J. Bisignano for former defendant Martin O'Malley. *See* Fed. R. Civ. P 25(d).

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

I. Background

   A. Factual

Gillikin has a history of physical and mental conditions. On the physical side, he was in an accident as a teenager. He has several musculoskeletal conditions including rotator cuff tear, osteoarthritis in his left wrist, DeQuervain's tenosynovitis, and carpal tunnel syndrome (CTS). Hearing loss and obesity also limit his functioning.

In May 2022, Gillikin underwent a CT arthrogram after reporting right shoulder pain. Tr. at 32. It showed full thickness rotator cuff tear without significant retraction or atrophy. *Id.*

After complaining of intermittent left arm tingling three months later, he underwent a cervical spine MRI. *Id.* It revealed mild to moderate findings. *Id.* Electromyography (EMG) and nerve conduction studies (NCS) showed severe carpal tunnel syndrome (CTS) on the left and mild CTS on the right. *Id.*

In October, Gillikin again reported constant numbness and pain in his upper extremities. *Id.* He underwent right CTS release surgery several years before and had left CTS release surgery performed in December 2022. *Id.* Following surgery, Gillikin reported doing well, with previous numbness resolved. *Id.* Providers discharged him with some temporary restrictions. *Id.*

An examination in June 2023 uncovered positive impingement signs and tenderness along the rotator cuff and subacromial bursa. *Id.* One month later, he reported bilateral wrist pain, worse on the left, with tightness, giving way, inflexibility, and pain with movement. *Id.* Gillikin also complained of numbness, tingling, and swelling, which did not improve with heat or ice. *Id.* An examination showed tenderness, positive Finkelstein's test, and some mild numbness and tingling in the left wrist. *Id.* His right wrist had no swelling but a mildly positive Finkelstein's test. *Id.*

2

In August, Gillikin had pain and weakness throughout his right shoulder consistent with rotator cuff damage. *Id.* He again sought care for shoulder and wrist pain the next month. *Id.* Although providers made no notes about his shoulder, they found tenderness in his left hand. Tr. at 32–33. They administered injections. Tr. at 33.

Gillikin experienced hearing loss before his accident, but it has worsened since then. *Id.* He can hear when the television is loud or by holding a speakerphone close to his ear. *Id.* At an October 2022 audiology evaluation, the examiner found mild to moderately severe sensorineural hearing loss on the right and moderate to severe mixed hearing loss on the left. *Id.* But Gillikin retained excellent word recognition. *Id.* He underwent Vistafix on the right ear five months later. *Id.*

As for mental health, Gillikin has experienced depression and anxiety. In May 2022, involuntary commitment papers reflected a severe episode of recurrent major depressive disorder. *Id.* He denied suicidal ideation. *Id.* A week later, Gillikin visited Coastal Carolina Neuropsychiatric Center reporting depression symptoms on and off for 20 years, with worsening symptoms over the previous six months. *Id.* He had anxiety about "everything" but noted Cymbalta had been effective. *Id.* Gillikin also had anxiety related to situational stressors. *Id.*

Two months later, Jared Laino, PA-C, noted Gillikin was doing well on medication, with partial remission of his depressive disorder. *Id.* Laino also noted an unspecified anxiety disorder. Tr. at 34. By December, Gillikin reported no concerns. *Id.* Although he has started therapy, he did not continue it. *Id.*

Eight months later, Gillikin complained of ongoing stressors and depressive symptoms. *Id.* A mental status examination found he had a sad mood but was cooperative, fait insight, judgment,

3

and attention, and intact memory. *Id.* Gillikin declined a referral to therapy. *Id.* He noted that medication helped but he still had trouble handling underlying stressors. *Id.*

Theodore Weber, Psy.D., a state agency psychological consultant, determined that Gillikin could understand, remember, and carry out simple, but not detailed, instructions. *Id.* He could sustain attention and concentration for two-hours at a time. *Id.* And he could have informal contact with others with no prolonged, intensive proximity to them. *Id.* The reviewer also determined that Gillikin could respond to simple and infrequent changes in the work setting. *Id.* And he may be absent one to two days a month. *Id.*

The ALJ determined that he has moderate limitations in the four broad categories of mental functioning: understanding, remembering, and applying information, interacting with others, concentrating, persisting, or maintain pace, and adapting or managing himself. Tr. at 29.

Gillikin testified that since his accident, he cannot bend or move his hands, which are stiff and painful. Tr. at 31. He described his right upper extremity as nearly useless. *Id.* Gillikin estimated that he could lift 15–20 pounds but had not tried to carry anything. *Id.* He cannot hold anything for a period of time and has problems picking up small items *Id.* Gillikin can load the dishwasher or washing machine if he avoids repetitive movements. *Id.*

Cortisone shots have numbed his upper extremity pain for a few weeks. *Id.* Providers told him that there were no other treatments. *Id.* Gillikin underwent CTS surgery on both hands, which initially helped his symptoms. *Id.* But his problems returned. *Id.*

Gillikin also experiences symptoms from PTSD, depression, and anxiety. *Id.* And he takes multiple medications for his conditions. *Id.* He avoids crowds because of facial scarring and an artificial ear. *Id.* He had hearing issues before his accident, and they have worsened. *Id.* And Gillikin has not received needed medical treatment because he lacks the financial resources. *Id.*

4

B. **Procedural**

In June 2022, Gillikin protectively applied for disability benefits alleging a disability that began one month earlier. After the Social Security Administration denied his claim at the initial level and upon reconsideration, Gillikin appeared for a telephonic hearing before an ALJ to determine whether he was entitled to benefits. The ALJ determined Gillikin had no right to benefits because he was not disabled. Tr. at 24–37.

The ALJ found that Gillikin lived with several severe impairments. Among these were right rotator cuff teat, osteoarthritis of the left wrist, DeQuervain's tenosynovitis, carpal tunnel syndrome, obesity, hearing loss, recurrent major depressive disorder, in partial remission, and an unspecified anxiety disorder. Tr. at 27. The ALJ also found that Gillikin's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 28.

Next, the ALJ determined that Gillikin had the residual functional capacity (RFC) to perform medium work with limitations. Tr. at 30. He could frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. *Id.* Gillikin could frequently balance, stoop, kneel, crouch, and crawl. *Id.* He could frequently reach with the upper right extremity. *Id.* And Gillikin could frequently use his bilateral upper extremities to handle, finger, and feel. *Id.*

Gillikin is limited to occupations where oral communication is short, simple, and clear, and takes place face-to-face. *Id.* He requires positions where workplace hazards are not identified by auditory emergency warnings such as warning sirens or public announcements (PA). *Id.*

Gillikin can understand, remember, and carry out short and simple instructions. *Id.* He cannot perform work requiring a specific production rate such as work that requires hourly quotas. *Id.* Gillikin can have frequent interactions with supervisors and co-workers and occasional

5

interactions with the public. *Id.* He can occasionally work close to co-workers, without tandem or team type work. *Id.* And Gillikin can have occasional changes in the work setting. *Id.*

Then the ALJ concluded that Gillikin could not perform his past work as a marine services technician or an aircraft repairer. Tr. at 35. But considering his age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Gillikin could perform. Tr. at 31. These jobs included laundry worker, automobile detailer, and store laborer. Tr. at 36. These findings led the ALJ to conclude that Gillikin was not disabled. Tr. at 37.

After the Appeals Council denied review, Gillikin commenced this action in September 2024. D.E. 1. Both parties ask the court to issue a decision in their favor. 10, 12.

## II. Analysis

The ALJ considered the state agency psychological consultant's opinion, finding it was partially persuasive. Tr. at 34. The ALJ noted the evidence supported several limitations assessed. *Id.* But he failed to explain why he did not incorporate into the residual functional capacity (RFC) determination the consultant's finding that Gillikin would be absent from work 1–2 days a month. And the ALJ did not explain why he rejected this restriction, or what evidence conflicted with it.

Lacking sufficient reasoning, borne out by the record, the court cannot be certain whether he overlooked this limitation or found the record did not support it. So this error warrants remand.

### A. Standard for Review of the Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a

6

particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

B.  **Standard for Evaluating Disability**

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id*.

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is not warranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional

7

limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id.*

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Opinion Evidence

Gillikin argues that the ALJ erred in considering the medical opinion evidence. He found a state agency reviewer's assessment partially persuasive. But the ALJ did not explain, nor does his decision disclose, why he excluded some of the assessed limitations from the residual functional capacity (RFC) determination. The Commissioner contends that the ALJ properly considered the medical opinion evidence. And he maintains that the ALJ had no obligation to adopt all the restrictions found by the reviewer. The undersigned finds that the ALJ did not offer a sufficient explanation for rejecting some of the limitations assessed. This omission forms a basis for remand.

8

The Regulations direct the ALJ to consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities ...

> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* §§ 404.1520(a)(2), 416.913(a)(2).

The Regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors:

> (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations,

9

purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) other factors that tend to support or contradict a medical opinion."

*Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

Supportability and consistency are the "most important" factors, and the ALJ must discuss how they considered these factors in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may explain their consideration of the other factors but need only do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *Id.*

The Regulations require the ALJ to "articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b), 416.920c(b). But when a medical source provides multiple opinions, the ALJ may use a single analysis to evaluate all the opinions from a single source, and the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if

10

considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

The ALJ discussed the opinion of Weber, a state agency consultant. Tr. at 34. Weber found that Gillikin could understand, remember, and carry out simple instructions, sustain attention for two-hour periods, and have informal interactions if they were not prolonged or close to others. *Id.* He could also respond to infrequent workplace changes and may be absent 1–2 days each month. *Id.*

The ALJ found this opinion partially persuasive. *Id.* He remarked that the evidence supported simple instructions, occasional changes, frequent interactions with co-workers and

11

supervisors, with no team or tandem work, and occasional interactions with the public. *Id.* But the ALJ did not address Weber's assessed limitation on work absences.

The ALJ erred in evaluating Weber's opinion. First, he failed to sufficiently analyze the supportability and consistency elements needed to determine its persuasiveness, as the Regulations require. And second, the ALJ failed to explain why he omitted a limitation that Weber found from the RFC determination.

### 1. Supportability and Consistency

The Regulations direct an ALJ to consider several factors when assessing evidence offered in a medical opinion. Supportability and consistency are the critical elements in determining the persuasive value of a medical opinion. Here, however, the ALJ did not point out the evidence Weber relied on to base his assessed restrictions.

The ALJ stated that "the evidence supports" some limitations, and then he listed certain restrictions. But the ALJ failed to identify the supporting evidence. More importantly, he identified no instances where the record conflicted with the limitations Weber found.

Weber remarked that the initial level determination in August 2022 found only mild limitations. Tr. at 98. But that assessment was not consistent with the longitudinal record when Weber formed his opinion eight months later. *Id.* And Weber observed that Gillikin reported worsening mental health symptoms. *Id.*

Gillikin had diagnoses of anxiety and major depressive disorder, which was recurrent and severe. His symptoms included panic attacks, agitation, and sleep disturbance.

In May 2022, Gillikin described experiencing panic attacks where he could not breathe. He had taken medication, but it was not effective. And he continued to suffer from depression and anxiety.

12

Two months later, Gillikin reported that medications helped somewhat but he had feelings of panic and situational stressors. Providers assessed major depressive disorder, recurrent and in partial remission, as well as anxiety, with the possibly of an adjustment disorder. They increased his medication.

By December, providers noted that he displayed a sad mood and congruent affect. He continued to have difficulty dealing with ongoing stressors. Providers started him on a trial of medication for his anxiety.

Gillikin stated that he does not go anywhere because of his injuries and depression. He has a hard time doing anything and was very bad at handling stress, quickly becoming agitated and frustrated. Gillikin stated that he had depression and very high anxiety because his life was falling apart. Gillikin's wife stated that stress quickly overwhelmed him. Tr. at 84.

So evidence noted in Weber's assessment corroborates the limitations he found.

The ALJ decision also discloses no analysis of the consistency factor addressing how Weber's opinion tracked, or diverged, from other evidence in the record. But Weber's report notes several record entries that follow his findings. Along with the evidence backing Weber's opinion establishing its supportability, the record shows that Gillikin continued to report ongoing depressive symptoms and situational stressors in August 2023. He complained of having no energy or motivation, and a mental status examination noted a sad mood and congruent affect. Gillikin noted some help from medication, but his difficulty at managing underlying stressors continued.

His testimony two months later confirms many of these findings. Gillikin has trouble going out and stays to himself. An accident as a teenager still affects his mental state, and he suffers from depression, anxiety, and PTSD. He has been hospitalized twice from his mental health conditions.

Other evidence in the record thus aligns with Weber's opinion.

13

### 2. Limitation Omitted

Despite finding Weber's opinion partially persuasive,[3] the ALJ did not adopt all of the limitations he found. The ALJ's lack of explanation for rejecting Weber's limitation on work absences is error.

An ALJ need not adopt all the finding in a medical opinion he deems persuasive. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (noting that an ALJ need not defer to any medical opinion or prior administrative finding); *Turner* v. *Comm'r of Soc. Sec.,* No. 23–1760, 2024 WL 2764722, at *5 (4th Cir. May 30, 2024) ("ALJs are not required to accept all components of . . . a claimant's limitations just because the ALJ finds them to be generally persuasive.") (citing *Thomas* v. *Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019)).

But an ALJ cannot assign persuasive value to a medical opinion without addressing material conflicts between that opinion and the RFC. *Ezzell* v. *Berryhill*, 688 F. App'x 199, 201 (4th Cir. 2017). "[A]n ALJ cannot implicitly reject portions of a doctor's opinion [that the ALJ found persuasive] that are inconsistent with her RFC" absent adequate explanation of her reasoning. *Adams* v. *Comm'r of Soc. Sec.*, No. 3:20-CV-00224-RJC, 2022 WL 634213, at *3 (W.D.N.C. Mar. 3, 2022); *Clark* v. *Berryhill*, No. 5:17-CV-143-DCK, 2018 WL 3014408, at *5 (W.D.N.C. June 15, 2018). An ALJ's explanation of why he rejects a limitation in an opinion found credible must allow a reviewing court to trace his reasoning. *See Saunders* v. *O'Malley,* No. 5:23-CV-48-RJ, 2024 WL 1116972, at *4 (E.D.N.C. Mar. 14, 2024) (remand required where ALJ failed to explain why he rejected a limitation to short instructions, despite finding the state agency

---

[3] It is unclear what part was not persuasive. It appears that the opinion was "persuasive," not "partially persuasive," but that the ALJ used the latter description to avoid accepting all of Weber's assessed limitations, such as the work absence restriction. The ALJ may to decline the limitation but must sufficiently explain of his reasoning. Without more, the characterization of an opinion as "partially persuasive" advances no sound basis to decline or reject a limitation assessed in a medical opinion.

psychologists' findings to be persuasive, given that limitation conflicted with jobs ALJ found claimant could perform); *Alonna A.* v. *Kijakazi*, No. CV 22–3115-CDA, 2023 WL 8373378, at *4 (D. Md. Dec. 1, 2023) (no logical bridge between the evidence and the RFC where the ALJ failed to explain why the limitations opined by sources whose opinions were found to be persuasive were not fully incorporated into the RFC) (citing *Woods* v. *Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)).

The ALJ found Weber's opinion partially persuasive, without explaining what parts were, and were not, believable. The ALJ's decision does not disclose why Weber's limitation finding Gillikin would be absent 1–2 days a month was excluded from the RFC. The ALJ did not identify evidence in the record that conflicted with this restriction. So it is not apparent why the RFC omits such a limitation.

The ALJ made no specific finding on how many days per month Gillikin may be absent from work. One may argue that there is an implicit finding that Gillikin's absences would fall within the threshold tolerated by employers. The undersigned cannot conclude that such an inference is sufficient in the face of Weber's finding otherwise. *See Ezzell*, 688 F. App'x at 201 (ALJ needs to resolve material conflicts between persuasive medical opinion and RFC).

And this issue is material to the disability determination. The Vocational Expert testified that employers would tolerate only one absence per month. Tr. at 72. More than one day off per month would preclude competitive employment. *Id.* So if accepted and incorporated into the RFC determination, being absent from work up to two days a month, as Weber found, would render Gillikin unemployable.

Lacking adequate explanation, it is unclear whether the ALJ overlook, or rejected, limitations Weber found that the RFC did not incorporate. It is thus unclear whether the RFC determination properly reflects all of Gillikin's well-supported limitations. So the undersigned

15

cannot conclude that substantial evidence supports the ALJ's determination. This issue warrants additional consideration upon remand.

## III.  Conclusion

For these reasons, the undersigned recommends that the court grant Gillikin's request for relief (D.E. 10), deny Bisignano's request for relief (D.E. 12), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated:  July 3, 2025

_____
Robert T. Numbers, II
United States Magistrate Judge